Filed 5/25/23  P. v. Edgar CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B320180 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA074945) |
| v. | |
| NEIL JASON EDGAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa M. Strassner, Judge.  Affirmed as modified.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, and Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Neil Jason Edgar (defendant) struck his girlfriend in the head with a claw hammer multiple times. A jury convicted him of second degree murder (Pen. Code, § 187, subd. (a)),[1] and he was sentenced to 36 years to life in prison. He raises multiple challenges to his conviction and sentence, but his challenges are meritless. We accordingly affirm the judgment, but order the abstract of judgment modified as directed.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

On October 16, 2018, defendant repeatedly struck Angela Gatewood (Gatewood) in the head with a claw hammer, killing her.

#### A. *Events leading up to the killing*

Defendant and Gatewood met years earlier, as defendant was the prison cellmate of Gatewood's adult son. Defendant and Gatewood dated on and off for years. Throughout this entire time, defendant regularly used methamphetamines.

In May 2018, following his most recent release from prison, defendant moved in with Gatewood. Over the next several months, defendant's drug use "really escalated," and his earlier suspicions that Gatewood was cheating on him grew more

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

impassioned and delusional. Specifically, defendant suspected that Gatewood was hosting orgies in their apartment, filming the sex acts using their smart TV as a camera, and uploading the resulting videos onto a "hidden" YouTube website and also a "Cheating Wife" website. Defendant's suspicions were based on the fact that Gatewood kept lint rollers in the house, that he once saw a handprint on the coffee table "way bigger" than his, that she did not always answer his calls, that some of the calendar entries on her cell phone were vague, that he believed she had other "hidden stuff" on her phone, and that her cell phone locked him out of further access after he entered the incorrect password too many times.

Defendant repeatedly accused Gatewood of infidelity, and she repeatedly denied it and told him that he was being delusional.

In the weeks immediately preceding October 16, 2018, defendant's methamphetamine use increased: He was "eating meth" and then "throwin' up," and he would get "really, really high" for days at a time. Defendant would often not let Gatewood leave the apartment, which prompted Gatewood to text defendant's father to report that she felt "unsafe" around defendant. During those weeks, Gatewood also started sleeping in a separate room, although she and defendant would communicate through text messages. In those texted conversations, defendant incessantly repeated his accusations of infidelity, and Gatewood responded by pointing out that he was high every time he accused her of "these things," by calling him a panoply of unflattering names (including a "fucking lying bastard," a "bitch," a "bottom of the barrel loser," a "jerk," a

3

"jackass," a "dumb meth head" and a "drug addict"), and by telling him that she was going to break up with him.

On the night of October 15, 2018, Gatewood told defendant she was going to leave him. Defendant spent the night smoking meth and looking through Gatewood's phone, and later admitted thinking, "I should just go up there and fuckin' kill her ass right now."

The next morning, Gatewood again told defendant he was being delusional as she was leaving for a convenience store. Defendant hopped into her car, and as they drove to and from the store, Gatewood relayed that she was "scared" for her life, that she had to "get away" from him, and that she would report him to the police if he continued accusing her of infidelity. Gatewood then dropped off defendant at their residence, and left to get something to eat. As soon as she drove away, defendant later admitted, "[he] decided [he] was gonna kill her." He proceeded to gather up the "things" he would need to effectuate the killing— namely, a claw hammer and rolls of tape from the garage—and then brought them into the apartment where they would be handy but hidden.

When Gatewood returned to the residence, she angrily told defendant she was unable to buy food because defendant had maxed out her credit card looking for evidence of her supposed infidelity on pornographic websites, said she was going to report defendant's theft to the police, called him a "bitch," and then walked into her bedroom and picked up the phone. At that point, defendant later admitted to thinking "there's only . . . two things can happen right now . . . . I'll go to jail or I'm gonna kill her and I'll go to jail."

4

Defendant then "ran" at Gatewood, hammer in hand, and started hitting her in the head with the hammer. He later lamented that "she wouldn't die" and that it "took a while" to kill her. He screamed at her, "Die! Die! Die!" While continuing to bludgeon her head, he also bit at one of her nipples "really hard."

After defendant felt she was dead, he set up two makeshift shrines: He placed an angel figurine and a photograph of him and Gatewood on her chest, and also placed a skull figurine on the floor with two rings leaning against it to symbolize "[n]ow it's done."

## B. *Post-killing events*

Defendant then got into his car and drove around for a few hours, ending up at the hospital from which he believed Gatewood was recruiting her sex partners for the orgies. He armed himself with a knife. He told the hospital staff he killed his girlfriend, and they called the police. Defendant then told the responding police officer that he killed Gatewood while high on meth because he suspected she was cheating on him. At one point, defendant grabbed at the officer's gun to try to induce the officer to shoot him; the officer subdued defendant without harming him.

## C. *Defendant's further confessions*

In addition to defendant's statements to the hospital staff and responding police officer that he killed Gatewood, defendant made two further confessions.

### 1. *Recorded oral confession*

After waiving his *Miranda* rights at the police station, defendant again confessed to killing Gatewood while being recorded.

5

## 2. *Written confession*

A few weeks after his arrest, and as defendant was being moved between jail facilities, his jail custodians found a letter on him. In pertinent part, the letter read:

> "I cannot reverse the damage I have inflicted on the Gatewoods or disgrace to the Edgars, all I may do is accept justice. I am guilty of the murder of Angela Gatewood which I committed on Oct. 16th 2018 apprx. 2 pm. Though under the influence of drugs I was sane, knowing right from wrong. I regret my crime."

## II. Procedural Background

The People charged defendant with a single count of murder (§ 187, subd. (a)). The People also alleged that he had personally used a deadly and dangerous weapon (namely, a hammer) (§ 12022, subd. (b)(1)), and that his 1999 conviction for robbery (§ 211) constituted a prior "serious" felony (§ 667, subd. (a)) as well as a strike within the meaning of our "Three Strikes" law (§§ 667, subds. (b)-(j), 1170.12, subds. (a)-(d)).[2]

The matter proceeded to a jury trial in February 2022.

The jury found defendant guilty of second degree murder and found the weapon enhancement to be true. Defendant admitted his prior convictions.

The trial court sentenced defendant to prison for 36 years to life, comprised of a base sentence of 30 years (15 years to life,

---

[2] The People also alleged that defendant had served four prior prison terms (§ 667.5, subd. (b)(1)), but the trial court struck those findings at sentencing. Thus, they do not figure into his sentence.

doubled due to the prior strike), plus one year for the weapon enhancement, plus five years for the prior serious felony.

Defendant filed this timely appeal.

## DISCUSSION

### I.    Evidentiary Error

Defendant argues that the trial court erred in admitting his written confession because his admission to being "guilty of the murder of [Gatewood]" and that he "was sane" and "kn[ew] right from wrong" at the time of the killing were "tantamount to inadmissible opinions that he was guilty of the charged crime of murder . . . rather than the lesser offense of voluntary manslaughter," and hence invaded the province of the jury to decide the ultimate question of the degree of homicide.  More specifically, defendant argues that the probative value of his confession was substantially outweighed by the danger of unfair prejudice and confusing the issues.  We review the admission of evidence for an abuse of discretion.  (*People v. Flores* (2020) 9 Cal.5th 371, 409.)

Witnesses can offer three different types of testimony: (1) factual testimony; (2) so-called "lay opinion" testimony, which is an opinion that is based on personal knowledge rather than any specialized expertise or knowledge, and which is helpful in conveying the sum total of what the witness observed (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 112-113; Evid. Code, § 702); and (3) expert opinion testimony, which is an opinion based on the witness's special expertise or knowledge, and which may or may not be based on personal knowledge (Evid. Code, §§ 801, 720, subd. (a)).

In his written confession, defendant offered factual testimony.  In stating that he was "guilty of [Gatewood's]

7

murder," he conveyed that he was the person who committed the killing. In stating that he was "sane" and "kn[ew] right from wrong," despite being "under the influence of drugs," he conveyed that he subjectively appreciated the wrongfulness of what he was doing at the time. These are factual assertions of which defendant had personal knowledge, and assertions which defendant—as the only still-living person who knew what he did as well as the only person who knew what he was thinking at the time—was *uniquely* able to make. Defendant was not offering expert opinion testimony because defendant has no relevant special expertise. And, contrary to what he urges on appeal, defendant was not offering lay opinion testimony. He was not trying to contrast murder to manslaughter, or to say anything about whether he was sufficiently provoked. Tellingly, defense counsel admitted as much in his closing argument while discussing the written confession: "[Defendant's] not a lawyer. He doesn't know the distinctions to be made between voluntary manslaughter, heat of passion, any of those things. He's just speaking in everyday terms the way anyone else would." (Accord, *People v. Gray* (2005) 37 Cal.4th 168, 212-213 ["[B]oth defense counsel and the prosecutor referred to some of the break-ins as 'burglaries.' . . . We find the use, by both sides, of the word 'burglary' as a shorthand reference meaning a break-in or unauthorized entry was innocuous in this context; the jury would not have understood the attorneys to be offering unsolicited testimony on whether the legal elements of a burglary had been proved"].)

Evidence Code section 352 grants trial courts the "discretion" to otherwise "exclude evidence if its probative value is substantially outweighed by the probability that its admission

8

will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) As factual testimony, defendant's written confession is highly probative of (1) defendant's actual conduct, and (2) his mental state at the time he killed Gatewood. Indeed, as noted above, defendant is the only person still on earth capable of attesting to the first point and the only person capable of attesting to the second. And this confession is neither confusing nor misleading, as even defense counsel acknowledged that the confession was factual testimony and did not purport to speak to the legal issues of provocation or voluntary manslaughter.

Defendant offers what boil down to two arguments in response.

First, he argues that witnesses who offer opinions on a defendant's guilt invade the province of the jury to determine culpability, and that defendant was offering an opinion on his own guilt and mental state. Defendant is correct that witnesses impermissibly invade the province of the jury by opining on a defendant's guilt. (E.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1227; *People v. Clay* (1964) 227 Cal.App.2d 87, 98-99; *People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 77; *People v. Torres* (1995) 33 Cal.App.4th 37, 47-48; *People v. Page* (1991) 2 Cal.App.4th 161, 188-189.) However, as defense counsel acknowledged to the jury and as we have concluded here, defendant was not offering an opinion on the provocation issue or the issue of his guilt of "murder" rather than manslaughter; he was offering factual testimony about what he did and what he was thinking. If *this* were inadmissible, no defendant's

9

confession would ever be admissible and that is most certainly not the law.

Second, defendant argues that the trial court's admission of his written confession also offended his constitutional right to due process. It did not. Where, as here, the admission of evidence complies with the rules of evidence, it also complies with due process. (E.g., *People v. Robinson* (2005) 37 Cal.4th 592, 626-627 ["'[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense"])

## II. Prosecutorial Misconduct

### A. *Pertinent facts*

#### 1. *The court instructs the jury*

After the close of evidence at trial, the trial court instructed the jury on the crimes of first degree murder, second degree murder, and on the lesser included crime of voluntary manslaughter due to provocation. In describing the provocation that can negate the intent to kill and hence warrant a conviction of voluntary manslaughter rather than murder, the court instructed:

> "The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment."

10

2.    *The prosecutor makes the opening portion of her closing argument*

During the opening portion of her closing argument, the prosecutor at first paraphrased the provocation jury instruction, explaining that provocation means "you're so overcome with your emotions that you react with emotion rather than . . . from thought . . . when you acted." The prosecutor then made three statements that either explicitly or implicitly framed provocation as turning—not on whether the provocation would cause a reasonable person's reasoning to be clouded by emotion—but rather on whether the provocation would cause a reasonable person to kill (that is, to act in a certain way).

First, the prosecutor argued:

"The most important thing is, again, a reasonable person would have acted the same in similar circumstances, and that's the big sticking point here. Okay? A reasonable person would have acted the same way in similar circumstances."

Second, the prosecutor argued:

"We've all been in situations where we've been angry and maybe we've said something that we wish we could take back. Maybe we've said hurtful things. We've been mean. Right? But does that make a reasonable person respond by picking up a hammer, running up on that person, striking them 14 times, bashing their head in and killing them? Is that a reasonable response to that? [¶] And I submit to you that it's not. This is not a reasonable response to those text messages, to the name calling. Right? To

11

the fact that their relationship was getting to a point where she was ready to leave."

Third, the prosecutor argued:

"But what do reasonable people do in those situations? They break up.  Right?  They move away from each other.  They move on.  They don't grab a hammer and bash in a person's skull."

Defendant objected to the first and third arguments, but not the second.  The trial court overruled those objections.

       3.     *The defense attorney tells the jury that the prosecutor's argument is inconsistent with the jury instructions*

In his closing argument, the defense attorney explained that "some of the things [the prosecutor] said about the law and the legal standards [regarding provocation] were just plain wrong" and that the prosecutor's description of the provocation issue was "absolutely 100 percent completely the wrong way of articulating what the issue[] before you [is]."  The defense attorney quoted verbatim the above-described jury instruction on provocation.  Then the defense attorney expounded on why what the prosecutor argued was inconsistent with the jury instruction:

"The standard in voluntary manslaughter is not whether an ordinarily reasonable person would kill in that situation.  That's not the standard.  That's not how it's determined.  It is not saying would you or would an ordinarily reasonable person have behaved in the same way that [defendant] behaved that day.  That's not the standard at all. . . .  [¶]  What the standard is is would an ordinarily reasonable person faced with the same set of circumstances have acted

12

rashly and without proper judgment. That's the standard."

4. *The prosecutor in rebuttal urges the jury to follow the instructions over her argument, and argues the jury should focus on whether the provocation would interfere with judgment rather than prompt a killing*

In her rebuttal argument, the prosecutor responded to the defense attorney's criticism that she improperly described the law regarding provocation:

> "So the first thing I want to talk about is something that defense counsel had said about my talking about what's required for adequate provocation in voluntary manslaughter . . . —the jury instructions are what are controlling. Right? You look at the jury instructions. That's where you're going to get the law. [¶] Right? [¶] What we say is not evidence. . . . You go by the jury instruction; and if there's any confusion about what voluntary manslaughter is, it's that the heat of passion, the provocation, has to invoke a response where a person responds from a place of passion, a place of impulse rather than judgment—okay?—*regardless of what the act is*." (Italics added.)

B. *Analysis*

Defendant argues that the prosecutor committed prosecutorial misconduct by misstating the standard for provocation. To prevail on a claim that a prosecutor committed misconduct by misstating the law during closing argument, a defendant must establish that (1) the prosecutor misstated the law, and (2) ""[i]n the context of the whole argument and the

13

instructions" [citation], there was "a reasonable likelihood the jury understood or applied [the misstatement] in an improper or erroneous manner."'" (*People v. Cortez* (2016) 63 Cal.4th 101, 130 (*Cortez*), quoting *People v. Centeno* (2014) 60 Cal.4th 659, 667; *People v. Rivera* (2019) 7 Cal.5th 306, 334; *People v. Silveria & Travis* (2020) 10 Cal.5th 195, 306.) The People concede that the prosecutor misstated the law, and we agree with this concession. Whether provocation is sufficient to negate malice (and hence to warrant a conviction of voluntary manslaughter due to heat of passion rather than a conviction of murder) turns on whether the provocation "would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.) What matters is "whether the average person would *react* in a certain way: with his reason and judgment obscured"—not "whether the average person would *act* in a certain way: to kill." (*Ibid.*) Because the prosecutor's initial arguments focused on whether a reasonable person would "pick[] up a hammer" and "strike [a person] 14 times" in the head, those arguments misstated the law. Thus, the question before us is whether the trial court abused its discretion in ruling that there was no reasonable likelihood the jury misapplied the prosecutor's misstatements in an "improper or erroneous manner." (*Cortez*, *supra*, at p. 130; *People v. Peoples* (2016) 62 Cal.4th 718, 792-793 [applying abuse of discretion review].)

There was no abuse of discretion. To begin, the prosecutor's misstatement of law was subsequently corrected. Specifically, the defense attorney repeatedly told the jury that the prosecutor's initial arguments were "wrong," and proceeded to quote the pertinent jury instructions and to explain why the prosecutor's argument was inconsistent with the plain language

14

of those instructions. Although, as defendant notes on appeal, the prosecutor in her rebuttal argument did not make an express "mea culpa" by admitting that her prior argument regarding the focus of the provocation inquiry was wrong, the prosecutor did explicitly tell the jury to "go by the jury instruction" rather than follow what she had argued about provocation and also voiced her agreement with defense counsel's correct view of the law that provocation focuses on whether the defendant "responds from a place of passion, a place of impulse rather than judgment . . . *regardless of what the act is*." (Italics added.) Furthermore, the jury instructions also corrected the prosecutor's initial misstatements of law. The pertinent instruction, as defendant concedes, properly instructed on the focus of the provocation inquiry and another instruction explicitly told the jury to "follow [the] instructions" "[i]f anything . . . said by the attorneys in their arguments . . . conflicts with [those] instructions." We presume jurors follow such instructions (*People v. Osband* (1996) 13 Cal.4th 622, 717), especially where, as here, the lawyer alleged to have argued in conflict with the instructions expressly tells the jury to follow the instructions over her arguments.

Defendant resists this conclusion with two further arguments.

First, he argues that the trial court's act in overruling his two objections constituted an endorsement of the prosecutor's initial misstatement of law. Although a court's conduct in overruling an objection can at times "convey[] to the jury that the prosecutor was correct" (e.g., *People v. Doane* (2021) 66 Cal.App.5th 965, 978), there was no danger of that here. Defendant's first objection was based on "[m]isstates the law" and "[p]rosecutorial misconduct"; the second, on "[p]rosecutorial

15

misconduct." The court responded to the first by saying that "[t]he court does not feel there's any prosecutorial misconduct" and by telling the jury, "the arguments of the attorneys are not evidence"; the court responded to the second by saying, "[t]here's no prosecutorial misconduct." It is not reasonably likely that a jury listening to this exchange would conclude that the trial court believed the prosecutor to have properly stated the law.

Second, defendant argues that the prosecutor's misstatement of the provocation standard is more likely to have affected the jury because it was really *three* separate misstatements and the error was hence magnified with each reiteration. Whether viewed as one misstatement or three, all misstatements were aimed at the same basic point; the defense attorney explained why the prosecutor was wrong on that point and how the jury instruction showed she was wrong; and the prosecutor urged the jury to follow the pertinent instruction and to focus on how the provocation would cloud a reasonable person's judgment rather than prompt them to take certain actions.

In light of our finding that there was no prosecutorial misconduct, we have no occasion to decide whether any error was prejudicial.

## III. Limitation on Length of Defense Counsel's Closing Argument

### A. *Pertinent facts*

After the trial court instructed the jury on the law, the prosecutor made her initial closing argument prior to lunch; that argument occupies 19 pages of reporter's transcript. Defense counsel then started his closing argument. He took 15 minutes before lunch and the entirety of the afternoon. Defense counsel's closing argument, from its beginning to the end of the afternoon,

16

occupies 75 pages of reporter's transcript. It is unclear precisely how long it took defense counsel to make his argument on that first date: The trial court said it was 3.25 hours; defense counsel, citing the handful of breaks, said it was 2.5 hours. At the end of the first day, the trial court asked defense counsel how much longer he needed; defense counsel responded that it was "difficult to estimate," but he would "guess" he had another "45 minutes to an hour" remaining.

The next morning, the trial court told defense counsel that "some of [his] closing argument has been redundant" and "repetitive"; noted that, in light of defense counsel's concession that defendant killed Gatewood, "this is a one-count case where both sides agree there is one issue" (namely, provocation); and informed counsel that the court would be exercising its discretion to limit his remaining argument to 45 minutes, which was within the range counsel estimated he needed to finish. Defense counsel objected, disputing that he had been "redundant" and "repetitive," asserting that it was "improper to provide any type of time limit on [his] arguments," and insisting that 45 minutes would—upon further reflection—*not* be enough to finish his argument. The court overruled the objections, and defense counsel completed his argument within the 45-minute limit. This further argument occupied another 22 pages of reporter's transcript, bringing the total defense argument to 97 pages of transcript.

The prosecutor completed her rebuttal argument in what occupies seven pages of transcript, for a total of 26 pages.

Defendant subsequently moved for a mistrial and a new trial on the basis that the trial court's time limits were unconstitutional. The trial court denied both motions.

17

**B.** *Analysis*

Defendant argues that the trial court erred in not allowing defense counsel to argue for as long as he wanted in closing, even though his closing argument ended up being more than three times longer than the total of the prosecutor's opening and rebuttal arguments (in terms of transcript length). Both the United States and California Supreme Courts have held time and again that trial courts have "great latitude" and "broad discretion" in controlling the "duration" of the parties' closing arguments in criminal cases, and may "limit counsel to a reasonable time" and otherwise "terminate argument when continuation would be repetitive or redundant." (*Herring v. New York* (1975) 422 U.S. 853, 862; *People v. Edwards* (2013) 57 Cal.4th 658, 743; *People v. Simon* (2016) 1 Cal.5th 98, 147 (*Simon*); *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184.) We review the trial court's exercise of its latitude and discretion only for an abuse of that discretion. (*Simon*, at p. 147.)

The trial court did not abuse its discretion in limiting defense counsel to an additional 45 minutes to complete his closing argument. By that time, counsel's closing *so far* had already been nearly four times longer than the prosecution's initial closing argument. Moreover, the case involved a single count and, in light of defendant's confession to being the killer, involved a single issue—namely, whether the killing was the result of legally sufficient provocation. And the court drew the 45-minute cap from the bottom of the range of time that defense counsel had himself estimated as needing to finish up. (Accord, *Wilson v. Kopp* (1974) 114 Cal.App.2d 198, 208 [time limit is reasonable when based in part on counsel's estimation of time needed].) On these facts, the court did not abuse its discretion in

18

limiting the remainder of defense counsel's argument to 45 minutes.

Defendant resists this argument with what boil down to three arguments.

First, defendant asserts that it was unfair—and also violated his Fifth, Sixth, and Fourteenth Amendment rights—for the trial court to place a time limit on his counsel's argument because (1) one hour of that argument was used reading to the jury the various text messages between defendant and Gatewood, which the trial court had admitted as exhibits without reading during the trial, and (2) the time limit denied counsel the ability to (a) discuss in greater detail defendant's recorded oral confession to the police, (b) discuss in greater detail the text messages counsel had spent an hour reading, and (c) discuss the beyond-a-reasonable-doubt standard and the importance of each juror relying on their own individual conscience. But defense counsel did not *need* to use an hour reading verbatim the bulk of the text messages to the jury during closing argument. Those messages were already in evidence, and counsel could have focused on the most pertinent passages. His decision to spend his time going through them in such detail was a tactical choice. The same is true with respect to defendant's complaint that his counsel needed to discuss defendant's recorded confession, the text messages, and the beyond-a-reasonable-doubt standard in greater detail; counsel had already discussed those topics during his argument; his desire to discuss them in more detail was a tactical choice. A trial court's decisions regarding the length or format of closing argument, however, is not invalid merely because it obligates a defense attorney to make tactical choices about how to present his or her argument. (See *People v.*

19

*Navarro* (2021) 12 Cal.5th 285, 320.) Were the rule any different, counsel would necessarily have a right to argue ad infinitum and potentially ad nauseum. Indeed, that is specifically what defense counsel incorrectly told the trial court he had a right to do. But that is not the law.

Second, defendant cites three cases that he claims support his counsel's purported right to argue as long as he wants. Defendant misreads those cases. He cites *People v. Gurule* (2002) 28 Cal.4th 557 for the proposition that defense counsel must always be "able to make a full closing argument" (*id.* at p. 649), but quotes that language out of context. *Gurule* held that a defendant did not have a right to make a supplemental closing argument after the jury requested a read-back of some testimony and after defendant "was able to make a full closing argument" at the conclusion of the trial. *Gurule* did not purport to revisit—let alone deviate from—the solid wall of precedent allowing courts to put reasonable limits on closing argument, even if that might prevent counsel from delivering what, in their subjective opinion, is a "full closing argument." Defendant cites *People v. Bolton* (1979) 23 Cal.3d 208 for the proposition that a defendant must always be able to "'argue all reasonable inferences from evidence in the record'" (*id.* at p. 212), but again quotes that language— which comes from the American Bar Association Standards for Criminal Justice—out of context. *Bolton* held that a prosecutor exceeded the bounds of proper argument by arguing facts not in evidence, and *Bolton* noted that the boundary of arguing reasonable inferences from facts in evidence is transgressed by arguing facts not in evidence. Defendant relatedly cites *People v. Farmer* (1989) 47 Cal.3d 888 (*Farmer*), overruled on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6, also

20

for the proposition that counsel in closing may argue reasonable inferences from the evidence (*Farmer*, at pp. 922-923), but once again quotes the language out of context. *Farmer* held that a prosecutor committed misconduct by relaying to the jury what was argued in a different trial because doing so exceeded even the inferences that may be argued from the evidence. Neither *Bolton* nor *Farmer* purported to erect an entitlement to argue *every* possible reasonable inference from the evidence irrespective of tactical choices.

Third, defendant argues that the trial court's reasoning imposing a 45-minute limit for the remainder of his counsel's argument was flawed because (1) the court overestimated the time defense counsel had already spent by 45 minutes (3.25 hours versus the 2.5 hours counsel stated on the record), and (2) the court erred in characterizing counsel's argument as being "redundant" and "repetitive." We elected to look at pages of reporter's transcript as a gauge of the length of argument (because the record does not contain time stamps), and that length reflects that defense counsel's argument was orders of magnitude longer than the prosecutor's—regardless of the actual time on the clock. The court's decision to limit further argument was reasonable. And we have reviewed the transcript of defense counsel's closing argument and agree with the trial court that counsel looped back to some arguments again and again, and that his argument was at times "redundant" and "repetitive."

## IV. Refusal to Dismiss Defendant's 1999 "Strike" Conviction

### A. *Pertinent facts*

Defendant has a long criminal history aside from the 1999 conviction for robbery that constituted a "strike" within the

21

meaning of our Three Strikes law.  Prior to that conviction, defendant sustained (1) a 1992 juvenile adjudication for robbery, (2) a 1994 juvenile adjudication for receiving stolen property, (3) a 1996 conviction for grand theft auto, and (4) a 1997 conviction for grand theft auto.  Following his release from prison on the "strike" conviction in 2013, defendant sustained a 2014 conviction for possession of child pornography.  When probation and parole violations resulting in reincarceration are considered, defendant spent approximately 22 out of the 24 years of his adult life in custody prior to the 2018 killing of Gatewood.

Prior to sentencing, defendant asked the trial court to dismiss the 1999 conviction as a "strike."  The trial court denied the motion.

### B.    *Analysis*

Defendant argues that the trial court erred in denying his motion to dismiss his 1999 robbery conviction as a strike.  We review such denials for an abuse of discretion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 373 (*Carmony*).)

A trial court has discretion to dismiss a "strike" allegation under California's Three Strikes law. (§ 1385, subd. (a); *People v. Williams* (1998) 17 Cal.4th 148, 162.)  The Three Strikes law was "devised" to impose longer sentences on "revolving-door career criminal[s]." (*People v. Gaston* (1999) 74 Cal.App.4th 310, 320 (*Gaston*).)  In deciding whether to exercise this discretion, the court is instructed to "'consider whether, in light of the nature and circumstances of [the defendant's] present felon[y] and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes] scheme's spirit, in whole or in part, and hence should be treated as though he had not

22

previously been convicted of one or more serious and/or violent felonies.'" (*Carmony*, *supra*, 33 Cal.4th at p. 377.) There is a "strong presumption" against granting a motion to dismiss a strike. (*Id.* at p. 378.)

The trial court did not abuse its discretion in denying defendant's motion to strike his 1999 "strike" conviction because defendant's criminal history shows him to be precisely the type of "revolving-door career criminal" for whom the Three Strikes law was devised. Since his teen years, defendant has committed one crime after another, starting with robbery and theft, moving on to possession of child pornography, and culminating in murder. Each time he has been released from custody, he has ended up back in custody within weeks or months of that release. He has been using methamphetamines for much of this time, and relapses into meth use—and crime—once released. We thus reject defendant's attempt to characterize himself as *not* "the type of hardened recidivist criminal for whom the Three Strikes law was designed."

Defendant resists this conclusion, and offers up five arguments.

First, he argues that he has been a meth addict with mental health issues throughout his life. Although drug abuse is *relevant* to a motion to dismiss, it is not *dispositive* of the issue (*People v. Garcia* (1999) 20 Cal.4th 490, 494, 503 (*Garcia*)), and any mental illness defendant might have suffered at other times is not pertinent here, where defendant, by his own admission, was lucid when he killed Gatewood.

Second, defendant argues that his 1999 strike conviction is "old." However, defendant was in custody most of the time between that conviction and the instant murder (and hence not in

23

a position to demonstrate that he was conforming his conduct to the law while out of custody) and had also committed other crimes during that interim period, so the age of the strike conviction is less relevant. (*Gaston*, *supra*, 74 Cal.App.4th at pp. 321-322 [age of prior strikes is relevant when defendant "led a crime-free life" in the interim, but not when he has "committed an unending series of felonies, as well as other crimes . . ."]; *People v. Daniels* (2009) 176 Cal.App.4th 304, 317 [age of conviction less relevant when "defendant had been incarcerated for the vast majority of that period"].)

Third, defendant urges that his sentence would still be long (21 years) even without the strike enhancement. While this factor is relevant (*Garcia*, *supra*, 20 Cal.4th at p. 503), it is not dispositive and must be assessed in light of defendant's prospects of committing future crimes (*Gaston*, *supra*, 74 Cal.App.4th at p. 315), which, in light of defendant's history, seem very likely (and hence counsel against dismissing the strike).

Fourth, defendant urges that his crimes have not been "escalating" because he went from robbery to theft to child pornography. Yet he ignores that he then committed *murder*, which is more serious than those prior crimes.

Lastly, defendant argues that nothing in the record shows that he "forever [is] immune to rehabilitation." Yet that is irrelevant because it is not the test for assessing whether a prior strike allegation should be dismissed. At bottom, defendant is asking us to reweigh the various factors and come to a different conclusion than the trial court. This is beyond our purview. (*People v. Myers* (1999) 69 Cal.App.4th 305, 309-310.)

24

## V.    Error In Abstract of Judgment

The abstract of judgment dated May 19, 2022, states that defendant was convicted of willful, deliberate, and premeditated murder.  This is incorrect, as defendant was convicted of second degree murder.  We can and do order that the abstract be corrected.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## DISPOSITION

The abstract of judgment dated May 19, 2022, is ordered amended to reflect that defendant was convicted of second degree murder, not willful, deliberate, and premeditated murder.  The trial court is ordered to prepare and forward to the California Department of Corrections and Rehabilitation a modified abstract of judgment.

As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.

HOFFSTADT

We concur:


_____, Acting P.J.

ASHMANN-GERST


_____, J.

CHAVEZ

25